**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

F I L E D

AUG 1 3 2013

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

JEANNE PRUITT, )
)
        Plaintiff, )
)
v. )     Case No. 1:12-cv-1390
)
FAIRFAX COUNTY SCHOOL BOARD, )
)
        Defendant. )

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Fairfax County School Board's (FCSB)

Motion for Summary Judgment (Dkt. No. 23). Plaintiff Jeanne Pruitt opposes the motion and a

hearing held before the Court on August 9, 2013.

## BACKGROUND

Jeanne Pruitt worked for the Fairfax County Schools as an Instructional Assistant (IA)

from August 2005 until her termination on September 20, 2012. During much of the relevant

time, Plaintiff worked as an IA in a self-contained autism class at Belle View Elementary

School. Plaintiff worked with two teachers in the classroom, Meg Wagner Boyd ("Boyd") and

Richard Hall, who were responsible for approximately nine to ten students. While Boyd and

Hall provided day-to-day direction to Plaintiff, they were not Plaintiff's supervisors and had no

control over her employment or placement within the school system. Thomas Kuntz, the

principal at Belle View Elementary School, was Plaintiff's supervisor and made all staffing and

grouping decisions for each classroom before each school year, in consultation with the school's

lead teachers.

1

1.    **Plaintiff's Injury**

In January 2010, Plaintiff complained to Boyd that she wanted "a break" from working with students in the self-contained classroom and would like to work with inclusion classes. Plaintiff, on the other hand, describes her communication with Boyd as notification of her disability due to her shoulder pain and a request for appropriate accommodations. Defendant claims that Boyd did not know that Plaintiff was requesting accommodations due to a disability, or she would have referred the matter to Mr. Kuntz. Defendant did not report her medical conditions to any other administrator at the school, including Mr. Kuntz.[1]

At the end of the 2009-2010 school year and before the 2010-2011 academic year was set to begin, Plaintiff was originally assigned to "float" between the classroom Boyd used to teach and a K-2 ABA class taught by Rosemary Genuario Wilson ("Genuario"). Plaintiff contends that following the 2009-2010 academic year, she was granted accommodations "to work in the inclusion class for part of the day with general education and a few special education students." This accommodation was reportedly granted by Boyd, in a letter recommending the accommodations to Kuntz just prior to her departure from the school. As Defendant explains, Boyd had no authority to grant any accommodations. Nonetheless, Kuntz informed Plaintiff that she could float between the two classes.

According to Defendant, when Plaintiff was informed of her assignments in August 2010, prior to the beginning of the school year, she complained to Genuario and Courtney Bernazolli ("Bernazolli"), Boyd's replacement as the lead autism teacher, that she thought her "main job was supposed to be with the inclusion kids." Genuario told Plaintiff that because three additional students had just enrolled in the class, she would need to spend the majority of her time in her

---

[1] According to Defendant, in 2008, Plaintiff requested "light duty" due to a wrist injury and 10 lb. lifting restriction, but Kuntz told her that there was no such thing as "light duty" for IAs.

classroom in order to maintain legally required student-to-faculty ratios.  Plaintiff again

complained to Bernazolli that her shoulder hurt when working in the K-2 class and Bernazolli

referred her to Kuntz.

### 2.    Report of Disability and Request of Accommodations

On September 9, 2010, two days after the students arrived to begin the school year,

Plaintiff informed Kuntz that she was suffering from shoulder pain, stating, "I cannot do it, I

cannot work with these kids. I can't do it."  Plaintiff then requested "a reasonable

accommodation."  Kuntz reviewed Plaintiff's job description with her and reminded her that in

order to continue working with students from kindergarten to the sixth grade, she needed to be

able to manage student behavior, which presumably includes physically restraining students at

times.  Kuntz then suggested Plaintiff get a note from a doctor indicating what tasks she could

and could not perform and reminded her that FCPS provided disability benefits through Liberty

Mutual.

On September 13, 2010, Plaintiff provided Kuntz with the requested medical information.

The note stated that Plaintiff was under treatment for a rotator cuff tear and should "avoid

pushing/pulling over 10 pounds, as well as raising her arm above the level of her shoulder," or

she would be "at risk to cause further injury to her shoulder."  Plaintiff also submitted a note

from her physical therapist, stating that her work requirements were exacerbating her symptoms

and that she should avoid participation in physically restraining students.  Defendant states that

Kuntz read the notes to indicate that Plaintiff could no longer manage student behavior without

injuring herself.

As Defendant notes, Belle View Elementary School has autistic students in every

classroom and all IAs are required to help manage student behavior in any setting.  There are no

3

circumstances at Belle View, therefore, where the ability to manage student behavior is not an essential element of employment. Every IAs position at the school would require the employee be able to physically restrain students.

Kuntz sent Plaintiff's medical notes to the FCPS Office of Disability and Leaves. On September 14, the Office directed Belle View to inform Plaintiff that she posed a safety risk to herself and others and was a potential "liability" to FCPS. They informed her that she would have to take leave.

### 3.    Interactive Process

According to Defendant, Plaintiff never requested any specific accommodation, other than telling Kuntz that she could not do her job. Nor did Plaintiff reach out to FCPS's Office of Equity and Compliance (OEC). As part of FCPS's and OEC's ADA compliance, the "interactive process" is triggered when the employee submits a written request for medical accommodations ("RFMA"), identifying the disability, accommodations requested, and support from a physician. It is undisputed that Plaintiff did not submit the RFMA to the OEC at this early stage.

### 4.    Disability

After leaving Belle View, Plaintiff applied for short-term disability ("STD") through Liberty Mutual, indicating that she was unable to perform her job and could not return to work until March 24, 2011. Plaintiff was granted STD beginning October 15, 2010 and running through March 14, 2011. Once the five-month STD ended, Plaintiff was considered for long-term disability ("LTD") by Liberty Mutual. At the same time, FCPS informed Plaintiff that she would need to remain on approved leave status by applying for a designated leave of absence for illness by February 22, 2011, or risk losing her position at the Belle View.

On February, 12, 2011, Plaintiff applied for LTD and was initially denied by Liberty

Mutual, when it determined that she could engage in "light duty" as a teacher's aide. The insurance company, however, failed to consider her work with autistic students among other errors and Plaintiff won her appeal. Plaintiff remained on LTD, retroactively, from March 15, 2011 to February 29, 2012.

On April 6, 2011, Plaintiff submitted her first written request for medical accommodations ("RFMA") to the Office of Equity and Compliance, stating that she could not perform the work function of lifting 10-20 pounds until May 1, 2011, but that she could nonetheless return to work with the weight restriction for the remainder of the year. According to Defendant, an OEC specialist immediately began an "interactive process," as required under the ADA. The OEC official spoke with Plaintiff and Liberty Mutual, but Plaintiff refused to sign a release that would allow OEC to contact her physician to clarify conflicting information in the RFMA regarding restrictions and accommodations. Eventually, the OEC specialist verified with Plaintiff that the 20-pound restriction was the only restriction and asked Kuntz to accommodate the temporary restriction. According to Defendant, Plaintiff did not object to this course of action or request alternative accommodations. Kuntz agreed to provide assistance to Plaintiff, having determined that "the position could be performed by making limited, temporary changes at the workplace," which were "consistent with the staffing needs of the school."

Plaintiff returned to the school on April 14, 2011 and was assigned to the K-2 autism self-contained class and would otherwise rotate into inclusion classes. Plaintiff worked for the two days prior to the beginning of spring break, but did not return to work when students returned to school. She called Kuntz over spring break, indicating that she "knew it was not going to work for me, because my shoulder is not going to want to stay in this K-2 all day." Plaintiff claims that she told Kuntz she was not being reasonably accommodated because the

5

autism class required significant lifting and restraining.

Plaintiff submitted a second RFMA to OEC on April 19, 2011, which included a doctor's note stating that Plaintiff was unable to perform the work function of "restraining/holding aggressive students," but "would be safely functional at a higher level class where the kids are more structured." Kuntz reportedly informed Plaintiff that Belle View did not have a position in a more structured class and that all of the IAs positions available required management of student behavior.

On May 9, 2011, Liberty Mutual granted Plaintiff's appeal for LTD. On May 18, OEC advised Plaintiff that due to her experience of pain attempting to physically interact with students, she could no longer meet the essential functions of her job.

On February 27, 2012, Plaintiff was released from LTD, fit for duty. On the same day, she submitted an additional accommodation request, including no physical altercations, limited overhead and heavy lifting, and placement in a more controlled class setting. Again, Belle View indicated that no position existed for an IA where those accommodations would be possible. On April 9, 2012, Plaintiff requested reconsideration, but Defendant again denied her accommodations because they affected an essential function of her job.

On May 14, 2012, Defendant informed Plaintiff that in order to maintain her position with FCPS, she would need to again apply for nondesignated leave, because her leave was not due to illness after her doctor released her to begin work and her LTD ended. While an employee may take unrestricted designated leave due to illness, nondesignated leave is only available to "active" employees "after five continuous years of working for FCPS." While Plaintiff had been working for FCPS for five years, she was on undesignated leave from March 15, 2011 to February 29, 2012. She was not, therefore, an "active" employee during this time

6

and could not be eligible for undesignated leave for another four years. At this point, Plaintiff's position was no longer protected and Defendant claims they were in a position to terminate her.

Nonetheless, the Office of Equity and Compliance agreed to continue the interactive process, searching for employment within FCPS at another school through the end of July. During this time Plaintiff also sought new employment. Then, on June 28, 2012, Plaintiff submitted a revised fitness for duty certification to OEC and her lawyer stated that she was "capable of working in a classroom environment where restraint would be utilized on an infrequent basis."

On July 20, 2012, Defendant informed Plaintiff that she was qualified to be placed in an open position as an IA in a general education position at Centre Ridge Elementary School in Centreville, Virginia. Defendant's letter stated that it could not guarantee there would not be any situations requiring weight-lifting beyond her restriction, but indicated that restraining students would be less frequent, i.e. not on a daily basis.

Plaintiff rejected the Centre Ridge assignment because it "did not accommodate her restrictions" because she needed to attend physical therapy near her home two days a week and Centre Ridge was too far away.[2] The day before classes were set to resume in the new school year, Plaintiff requested placement at two of her schools of choice. Defendant maintained that the Centre Ridge placement was an accommodation based on the latest medical information provided and refused to place her in yet another school based on accommodations that Plaintiff had never sought before. OEC emailed Plaintiff to communicate that she was expected to report to Centre Ridge as scheduled. Plaintiff did not show up for classes as required.

---

[2] Defendant notes that Plaintiff was free to take sick leave for medical appointments as she had done in the past. Furthermore, Plaintiff did not seek an accommodation to leave for physical therapy beyond normal sick leave nor did she at any time request an additional accommodation that would allow her to be near her physical therapist.

7

On September 20, 2012, Plaintiff was terminated by FCPS for failure to comply with regulations governing hours of work, absences and use of leave, and for "neglecting or abandoning [her] position by failing to notify and receive approval for leave." On September 22, 2012, Plaintiff filed an ADA claim with the Equal Employment Opportunity Commission ("EEOC"). Two months prior to her actual dismissal from FCPS, on July 9, Plaintiff's attorney requested a right to sue letter from EEOC. The right to sue letter was issued on October 11, 2012.

## ANALYSIS

### I.    COUNT I – Discrimination and Wrongful Termination in Violation of the ADA

To prove discrimination based on a disability under the ADA, a plaintiff must show that: (1) she is an individual with a disability within the meaning of the statute, (2) the defendant had notice of the disability, (3) with reasonable accommodation she could perform essential functions of the position sought, and (4) the defendant refused to make reasonable accommodations. *Ainsworth v. Loudon County School Board*, 851 F. Supp. 2d 963, 980 (E.D. Va. 2012) (citing *Rhoads v. Fed. Deposit Ins. Corp.*, 257 F.3d 373 (4th Cir. 2001)). In addition, to support a wrongful termination claim, the plaintiff must prove that (1) she is within the ADA's protected class, (2) she was discharged, (3) at the time of her discharge, she was performing the job at a level that met her employer's legitimate expectations, and (4) her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. *Ainsworth* at 978.

#### A.    Disability under ADA

Under the ADA, a disability is "any physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2); 29

U.S.C. § 705(20)(B). Furthermore, courts have held that a temporary condition does not constitute a disability within the meaning of the ADA. As noted, Plaintiff suffered an injury due to post-operative recovery of a rotator cuff repair. While this injury limited Plaintiff's ability to satisfy the essential elements of her employment without reasonable accommodations, as admitted by Plaintiff, Defendant argues the injury was temporary. It cannot, therefore, qualify under the ADA as a disability. Plaintiff argues that her injury has been ongoing since September 2010 and is not temporary.

Defendant also argues that Plaintiff is not a "qualified person with a disability" because she was unable to work while she was receiving disability benefits. As Defendant cites, "it is well settled that an individual who has not been released to work by his or her doctor is not a qualified individual with a disability." *Kitchen v. Summers Continuous Care Center*, 552 F. Supp. 2d 589 (S.D. W. Va. 2008) (citing *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209 (4th Cir. 1994)). As evidenced by the statements and supporting documents from Plaintiff and her doctors in support of her disability benefits submission to FCPS and Liberty Mutual, Plaintiff could not perform the essential functions of her position and was, therefore, unable to come to work. Accordingly, Plaintiff's inability to perform essential functions of her job may prevent her from being considered a "qualified person with a disability" under the ADA. Nonetheless, there is evidence from Plaintiff's doctor that she could have performed her essential job functions with reasonable accommodations. Therefore, a genuine issue of material fact exists as to whether Plaintiff had a "disability," under the ADA definition.

### B.    FCPS had Notice of the Disability

Assuming that Plaintiff was disabled, Plaintiff undoubtedly notified FCPS of her disability no later than April 6, 2011 when she filed her first RFMA with OEC. Defendant was

9

also on notice of Plaintiff's physical limitations, if not disability, when she informed the Belle View Principal, Mr. Kuntz, of her disability and subsequently provided a physician's note on September 13, 2010.

### C.   With Reasonable Accommodation Plaintiff Could Not Perform her Job

Under the ADA, a plaintiff must be able to perform the essential duties of their employment provided her employer grants reasonable accommodations for her disability. Defendant argues that even given reasonable accommodations, Plaintiff was unable to perform the essential duties of her job and cannot satisfy this element of a prima facie ADA claim. According to the job description for Plaintiff's position, management of student behavior and crisis intervention are essential elements of the employee's duties. To determine if a given function is essential the Court must consider five factors: (1) the written job description, (2) the employer's judgment as to what functions are essential, (3) the amount of time an employee spends on a given function, (4) consequences of employee not performing the function, and (5) the number of employees among whom the function can be distributed. 42 U.S.C. § 12111(8); *hill v. Harper*, 6 F.Supp.2d 540, 543 (E.D. Va. 1998).

For an Instructor's Assistant in a self-contained classroom for autistic students, it is essential that the employee be able to restrain students when necessary. According to unrefuted statements from Belle View Principal, Mr. Kuntz, due to the special circumstances of the school's students, situations requiring crisis intervention present themselves almost daily. An employee that cannot physically restrain a student cannot, therefore, perform the essential functions of an IA in an ABA autism class.

No accommodation exists at Belle View Elementary School that could have accommodated Plaintiff's need to avoid physically restraining students in an emergency

10

situation. Plaintiff cannot, therefore, satisfy her burden of demonstrating that the circumstances of the case satisfy the elements of a *prima facie* case for ADA discrimination or wrongful termination.

**II.    COUNT II and III – Failure to Engage in the Interactive Process and Provide Reasonable Accommodations**

Under the ADA, the interactive process and the employer's duty to accommodate an employee with an ADA disability is "triggered at the time the employee provides her employer with a release from her medical health care professional which essentially states that the employee has the ability to perform the essential functions of her job with reasonable accommodation." *Kitchen* at 589. Adequate notice must include a communication to the employer describing the nature of the disability as well as the employee's need for accommodations for that disability. *EEOC v. Fed. Express Corp.*, 513 F.3d 360, 369 n.5 (4th Cir. 2008).

Defendant argues that this trigger did not occur until Plaintiff eventually filed her RFMA with the OEC. Prior to that time, her communications with supervisors were not sufficient to trigger an interactive process, as required under the ADA. Furthermore, an OEC specialist requested Plaintiff sign a waiver granting access to her physician, beyond the note provided, but Plaintiff refused. While Plaintiff provided notice to the Belle View Principal, the physician's note, which included physical restrictions due to her injury, did not suggest that her physical limitations could be accommodated and no accommodations were requested at that time.

Once Plaintiff filed her first RMFA with OEC on April 6, 2011, the interactive process was undoubtedly triggered. Defendant claims that it engaged in the interactive process, attempting to accommodate Plaintiff's physical limitations and, eventually, attempted to place Plaintiff in a general education class at another FCPS school. In fact, Defendant attempted to

11

make a number of accommodations despite reservations about Plaintiff's ability to satisfy

essential functions of her duties. Defendant's first accommodation consisted of a "temporary

accommodation" whereby Mr. Kuntz asked the teacher in charge of the classroom where

Plaintiff was to be assigned to provide Plaintiff with lifting assistance for the remainder of the

school year. Mr. Kuntz determined that "the position could be performed by making limited,

temporary changes at the workplace," which were "consistent with the staffing needs of the

school." Memo in Support at 11.

Even before the student arrived at school the day Plaintiff returned to work, she informed

the teacher she was assisting that she "knew it was not going to work for me, because my

shoulder is not going to want to stay in this K-2 all day." *Id.* at 12. Plaintiff worked two days in

the new arrangement and informed Mr. Kuntz that she would not be returning after the spring

break. Plaintiff then submitted a second RFMA stating that she "would be safely functional at a

higher level class where kids are more structured." *Id.* Mr. Kuntz advised Plaintiff that because

of Belle View's unique student population, there were no available positions in classes with

"more structure." In addition, during this time when the OEC was working with Plaintiff, the

office was also engaged with Plaintiff's union representatives. By May 18, 2011, OEC advised

Plaintiff that it could not place her in a more structured class in which an IA was not required to

manage student behavior. Furthermore, because Plaintiff reported experiencing pain assisting

students during her two days of work, she could not physically interact with students and could

not meet that essential function of her employment.

In March 2012, the Office of Equity and Compliance again attempted to find

accommodations for Plaintiff; and, again, Plaintiff refused to provide medical support for her

restriction or to sign a medical waiver allowing OEC to properly determine what restrictions

were required and what accommodations might be necessary. OEC nonetheless reached out to

Plaintiff who confirmed that she could not work with students with whom she might have

physical altercations. The OEC official informed Plaintiff that if she was unable to perform the

essential function of physically restraining students, then she was no longer qualified for an IA

position. The OEC official then informed Plaintiff that there were no IA positions available

within FCPS that did not require behavioral management of students. This interaction between

OEC and Plaintiff continued through June 2012.

Finally, in June 2012, Plaintiff informed FCPS and OEC that she could work "in a

classroom environment where restraint would be utilized on an infrequent basis." *Id.* at 16. At

this point, OEC began searching for a position where "restraint would be utilized on an

infrequent basis." Eventually, OEC located an open IA position at Centre Ridge Elementary

School. The Principal at Centre Ridge had created a program that pulled students from the

classroom to work with a teacher or IA in another area. There smaller groups would,

presumably, present a less frequent need to restrain students.

On July 23, 2012, OEC informed Plaintiff of her new position at Centre ridge by email

and letter. Based on the information provided to OEC by Plaintiff, her counsel and her

physician, they determined that the accommodation satisfied her need to less frequent restraint.

Defendant, however, stated in its letter that "given that the essential function of the position

requires managing crisis situations," FCPS "cannot guarantee that you will not encounter

situations" where controlling student behavior is necessary. *Id.* at 17.

Plaintiff then rejected OEC's accommodation, claiming that "it did not accommodate her

restrictions" because she needed to attend physical therapy twice a week near her home. Plaintiff

then provided OEC with the names of several specific schools where she would be willing to

13

work.  None of those schools had openings for an IA with Plaintiff's required accommodations.
On August 17, OEC communicated to Plaintiff that it provided accommodations were consistent
with the only information provided by Plaintiff, considering her refusal to sign the medical
waiver or provide additional information.  On the Thursday before students were set to arrive for
the new school year, OEC directed Plaintiff to report to Centre Ridge or she must apply for
approved leave status.  Plaintiff did not report to her position at Centre Ridge on the first day of
the school year or any at any later date and did not apply for approved leave.

On September 20, 2012, Plaintiff was terminated for failure to comply with FCPS
regulations governing hours of work, absences and use of leave, and for "neglecting or
abandoning [her] position by failing to notify and receive approval for leave." *Id.* at 19.

Under the circumstances of the case, FCPS and OEC made every attempt to engage with
Plaintiff in the interactive process, particularly following submission of her first RFMA.
Plaintiff's requested reasonable accommodations provided a moving target for Defendant, who
engaged with Plaintiff in good faith to find an appropriate position within the school system.
Plaintiff, nonetheless, refused to accept the very accommodation she sought when Defendant
placed her in a general education school, in a small group setting and where the need to
physically restrain a student was far less likely than in the self-contained autism classrooms.

Defendant's communications with Plaintiff as well as its consistent attempts to provide
Plaintiff with reasonable accommodations despite Plaintiff's apparent lack of cooperation clearly
satisfy Defendant's burden to engage in the interactive process.  In addition, Defendant's
attempts to place Plaintiff in alternative settings, particularly its placement at Centre Ridge,
clearly satisfy Defendant's burden to provided Plaintiff with reasonable accommodations.

14

## CONCLUSION

Accepting Plaintiff's contention that she is disabled for purposes of the ADA, Defendant acted appropriately and consistently with the ADA.  The Office of Equity and Compliance engaged with Plaintiff as soon as they received Plaintiff's formal notice by way of the RFMA. Furthermore, Defendant provided Plaintiff with reasonable accommodations based on the limited information revealed to it by Plaintiff.  By identifying the unique position at Centre Ridge, which included small groups of students outside of a typical class room and among general education students rather than those with special needs, and reserving that position for Plaintiff, Defendant also satisfied requirements under the ADA that an employer provide reasonable accommodations for an employee with a disability.   There are no remaining genuine issues of material fact. Defendant is entitled to Summary Judgment as a matter of law.

For the reasons contained herein and for good cause shown, Defendant Fairfax County School Board's Motion for Summary Judgment is GRANTED.

An appropriate order shall issue.

August 13, 2013
Alexandria, Virginia

/s/
Liam O'Grady
United States District Judge

15